**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Leonard B. STEELE, (83–5108), Marvin Lee Echols, (83–5109), David A. Warren, (83–5110), Jackie Wayne Scarborough, (83–5111), Defendants-Appellants.**

**Nos. 83–5108 to 83–5111.**

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 16, 1983.

Decided Feb. 9, 1984.

Certiorari Denied May 21, 1984.
See 104 S.Ct. 2396.

P. Bruce Kirwan argued, Rubin, Winter, Goger & Kirwan, Atlanta, Ga., for Steele.

Robert G. Chadwell argued, Knoxville, Tenn., for Echols.

Geoffrey C. Fleck argued, Weiner, Robbins, Tunkey & Ross, Alan S. Ross, Miami, Fla., for Warren.

Jerry Summers, Chattanooga, Tenn., Alan S. Ross, Miami, Fla., Thomas Wyatt argued, Chattanooga, Tenn., for Scarborough.

John W. Gill, Jr., U.S. Atty., John C. Cook argued, W. Thomas Dillard, Asst. U.S. Attys., Chattanooga, Tenn., for the U.S.

Before ENGEL and KEITH, Circuit Judges, and PRATT, District Judge.*

KEITH, Circuit Judge.

Appellants Leonard B. Steele, Marvin Lee Echols, David A. Warren, and Jackie Wayne Scarborough were charged in a two-count indictment with conspiracy to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1), and possession of cocaine, in violation of 18 U.S.C. § 2. The interception of the appellants yielded $400,000 in cash and over 1,200 pounds of cocaine. This cocaine was assigned a street value of approximately $400 million.

On July 20, 1982, Warren and Echols filed a motion to suppress evidence seized from their car, including the $400,000 ultimately introduced into evidence against them at trial. After a hearing on the motion, it was denied by the trial court. Prior to trial, appellants also jointly moved for the dismissal of the indictment or the exclusion of the trial testimony of government informant James C. Trammel. They asserted

* Hon. Philip Pratt, United States District Judge for the Eastern District of Michigan, sitting by designation.

that Trammel, a chief prosecution witness, had eavesdropped on privileged attorney-client communications and thereby invaded the "defense camp". The trial court denied the appellants' motions.

A jury trial commenced on November 2, 1982. At the close of the government's case, and again after the presentation of the evidence, the appellants moved for judgments of acquittal which the trial court denied. During the government's case, prosecution witness Trammel, in response to a question posed by counsel for co-defendant, testified that Warren had been incarcerated in South America. Warren moved for a mistrial or severance, which the court subsequently denied.

At the conclusion of the trial, the jury returned a verdict declaring the appellants guilty as charged. Warren was sentenced to fifteen years imprisonment on Count I, and ten years imprisonment on Count II. In addition, a three-year parole term was imposed, and one year imprisonment on a gun charge. All sentences were to run consecutively, for a total of twenty-six years. Echols was sentenced to ten years imprisonment on Count I, and a consecutive three-year period of probation on Count II. Steele was only named in Count I of the indictment, and was given a fifteen-year sentence and a $25,000 fine. Scarborough was sentenced to imprisonment for fifteen years on Count I, and ten years on Count II. The sentences were to run consecutively, and a mandatory parole period of three years was imposed to run consecutively with the periods of incarceration.

Subsequent to trial, the appellants filed an additional motion for "an evidentiary hearing on the issue of governmental misconduct and seeking dismissal with prejudice" on the basis that another government informant, in addition to Trammel, had invaded the "defense team". They alleged that the informant, Charles Scott, was working as a defense team investigator while he was also working as a government informant. A hearing was conducted on the appellants' motion, after which the trial court denied the motion. The court also denied appellants' motion for judgments of acquittal notwithstanding the verdict as well as their motions for new trials. This appeal followed. For the reasons set forth below, we affirm.

## I.

### FACTS

In early July of 1982, appellant, Leonard Steele, contacted James C. Trammel to discuss the possibility of transporting a load of cocaine from Tennessee to Florida. Steele told Trammel that he would receive $40,000 for hauling the load. Trammel conveyed information regarding this discussion to Drug Enforcement Administration (DEA) agents in Atlanta.

On July 10, 1982, Steele again contacted Trammel and told him to meet David Warren at the Primeway Inn, near Knoxville, Tennessee, to pick up the drugs. Trammel rented an Oldsmobile with Georgia license tag number AA1051. This information was also conveyed to the Atlanta DEA officials.

Trammel drove to the Primeway Inn and went to Warren's room, where he was met by Marvin Lee Echols, Warren's brother-in-law. Warren entered later, and using scanning equipment, checked to see if the room was bugged. The three men then left in Warren's Cadillac with Echols driving. Trammel testified that during the drive, Warren used a two-way radio in an attempt to contact the "Red Baron".[1] Warren indicated that an airplane was going to land on the mountain soon with the drugs, and that the "Red Baron" would be in a motor home.[2] Warren gave Trammel $2,000 and told him that Steele had said he needed some money to pay bills.

Meanwhile, Atlanta DEA Agent Mona Polen called Nashville DEA Agent Bernard

---

1. The "Red Baron", who was to pick up the cocaine, was believed to be Jackie Scarborough.

2. The airplane, which was subsequently seized and searched by the DEA agents, landed at the Rockwood Tennessee Airport with the cocaine.

Redd at approximately 6:30 p.m. on July 10, 1982. Agent Polen told Agent Redd of the previous conversations with Trammel, and told him that Trammel was on his way to the Primeway Inn in Knoxville. Agent Redd and Agent William Tucker drove to the Primeway Inn in Knoxville, and located the rented Oldsmobile, Georgia license number AA1051, in the parking lot. They then established surveillance over the subjects. At approximately 10:30 p.m. on July 10, 1982, Agent Redd observed Warren's Cadillac, Georgia license number XRB760, as it entered the parking lot of the Primeway Inn. Echols was driving, and the car also contained David Warren and James Trammel. They went into a room at the Inn, and were soon joined by Robert S. George. He was driving a dark Dodge Diplomat, Georgia license number XKM481.

Later, Echols, Warren, Trammel, and George were observed leaving the motel together. Echols and Warren left in the Cadillac, George left in his Dodge, and Trammel left in the Oldsmobile. Less than a mile away from the Primeway Inn the three vehicles pulled into an Aztec gas station, where Warren was observed making one or more telephone calls from a pay telephone.

The three vehicles then left the gas station and traveled to the Coachman Inn, Loudon, Tennessee, arriving at approximately 12:50 a.m. on Sunday, July 11, 1982. All four men went into the motel office, where one told the motel employee they had just driven from Ohio. Echols obtained Room 111 for himself and Warren, and George obtained Room 117 for himself and Trammel. At approximately 1:40 a.m., Warren and Echols left the motel parking lot in the Cadillac, and headed north on the interstate.

At approximately 3:20 a.m., DEA agents observed a GMC motor home driven by Jackie Wayne Scarborough arrive at the motel. The motor home parked just outside Room 135, which was registered in the name of Garland Watson, an associate of Scarborough. At approximately 4 a.m., Scarborough left the motel driving the motor home.

Shortly before 7 a.m. on July 11, 1982, David Warren returned to the vicinity of the Coachman Inn. Just before he reached the motel parking lot, he pulled across the street from the motel to a pay telephone booth. He was observed getting out of the Cadillac and making calls at the telephone booth. Echols was still with Warren, and following these calls they returned to the motel.

At approximately 8:30 a.m. a blue van, followed closely by the motor home driven by Scarborough, was observed pulling into the motel parking lot. After the blue van and motor home were parked in the back of the motel, a man, later identified as Michael Briggance, was seen getting out of the van. He then carried a bulging green plastic garbage bag to the motor home. Shortly afterwards, David Warren was observed walking from the direction of Room 135, and the motor home, toward Room 111. At another time Scarborough was seen walking from the direction of Room 135 toward Room 111, and then back toward Room 135.

At approximately 10 a.m., David Warren was seen getting into his Cadillac and driving to the telephone booth across from the motel. He made several telephone calls, and then returned to the motel. Within forty-five minutes to an hour he returned to the same telephone booth and made more calls, and again went back to the motel.

Around noon Trammel, Echols, Warren and George appeared in the parking lot together. Trammel testified that at that point he had a conversation with Warren and Echols about ways to transport the drugs. Warren told Trammel that Trammel would drive the blue van. Warren was heard by agents to say in a loud voice that the keys had been locked in the van. Trammel was then observed breaking into the van to get the keys. Also, Warren told Trammel they would drive the load to Atlanta, where it would be split up and put into other vehicles. These vehicles would then leave from Atlanta in four hour inter-

vals, and would meet again in Ft. Pierce, Florida.

Just before noon on July 11, 1982, Warren, Trammel, Echols and George left the motel parking lot. Warren left first, driving the Cadillac, followed by Trammel driving the van. George was driving the Dodge, and Echols drove the Oldsmobile. All four vehicles traveled closely together down the interstate toward Atlanta.

When the caravan reached Bradley County, it pulled off exit 20, and stopped at the Pineview Superette. Echols then left the group, and was stopped by agents as he attempted to get back on the interstate. The other three individuals were confronted by DEA agents at the Pineview Superette. Trammel immediately identified himself to Agent Redd, and told him that the drugs were in the van. At that point the van was searched, and twenty-six duffel bags, containing approximately 1,254 pounds of cocaine were discovered. In addition, agents found two letters, addressed to Scarborough, in the rear of the van, partially underneath the duffel bags. The four vehicles were subsequently transported to the Cleveland, Tennessee police station where they were searched.

Later that afternoon, after the arrests in Cleveland were made, Scarborough, Briggance, and several others were arrested at the Coachman Inn. The motor home was seized, and later searched. Room 135 was also searched, pursuant to a search warrant.

On July 13, 1982, a twin engine Beechcraft airplane was seized and searched pursuant to a search warrant at the Rockwood Airport in Rockwood, Tennessee. A small brown tag with Spanish writing was found in the airplane. It matched the brown tags found on the duffel bags containing cocaine. Also, fibers taken from the airplane matched fibers taken from the duffel bags. A picture of the airplane found in Scarborough's possession at the time of his arrest matched the airplane which was seized at the Rockwood airport.

---

**3.** Appellant Leonard Steele adopted the arguments of his co-defendants pursuant to Fed.R.

## II.

## ISSUES

The appellants raise numerous issues on appeal, however we address only those having merit.[3] The appellants assert that they were denied "due process, effective assistance of counsel, and a fair trial, in violation of their Fifth and Sixth Amendment rights, due to the deliberate, prolonged, and intentional invasions of the 'defense camp' and the interception of privileged attorney-client communications by two informants." Essentially, appellants assert that government witness James C. Trammel and defense investigator Charles Scott were government informants, and that they invaded the defense camp and were privy to attorney-client communications and trial strategies. We find this argument to be unpersuasive.

## A. EFFECTIVE ASSISTANCE OF COUNSEL

The courts have enunciated several factors to determine whether there has been an invasion of the attorney-client privilege in violation of the Sixth Amendment right to effective assistance of counsel. *Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). These include: 1) whether the presence of the informant was purposely caused by the government in order to garner confidential, privileged information, or whether the presence of the informant was the result of other inadvertent occurrences; 2) whether the government obtained, directly or indirectly, any evidence which was used at trial as the result of the informant's intrusion; 3) whether any information gained by the informant's intrusion was used in any other manner to the substantial detriment of the defendant; and 4) whether the details about trial preparations were learned by the government. *Weatherford,* 429 U.S. at 554, 97 S.Ct. at 843; *United States v. Brug-*

App.P. 28(i).

**586**

*man,* 655 F.2d 540, 546 (4th Cir.1981). Even where there is an intentional intrusion by the government into the attorney-client relationship, prejudice to the defendant must be shown before any remedy is granted. *United States v. Morrison,* 449 U.S. 361, 365–66, 101 S.Ct. 665, 668, 66 L.Ed.2d 564, *reh'g. denied,* 450 U.S. 960, 101 S.Ct. 1420, 67 L.Ed.2d 385 (1981).

Echols, Warren and Scarborough all testified that Trammel repeatedly attempted to get in close proximity to Warren and his attorney (Ross) when they were discussing this case in the jail. Co-defendant Echols testified that attorney Ross asked the other defendants to provide him with some privacy, and noted that all but Trammel did so. After the conversation between Ross and Warden, Echols further testified that Trammel commented: "Bullshit, they ain't gonna believe that." The appellants categorized Trammel's presence in the jail as the invasion of an "agent" in the defense camp, and rely on *United States v. Gartner,* 518 F.2d 633 (2d Cir.), *cert. denied,* 423 U.S. 915, 96 S.Ct. 222, 46 L.Ed.2d 144 (1975), in asserting a constitutional violation. In *Gartner* the court stated:

> [W]hen conduct of a government agent touches upon the relationship between a criminal defendant and his attorney, such conduct exposes the government to the risk of a fatal intrusion and must be accordingly carefully scrutinized. The *per se* rule may result in dismissal of the indictment or a reversal. It has been applied in the past to the government's intrusion upon the attorney-client relationship of a defendant where that conduct has been an offensive interference with the defendant's rights without any justification. The *per se* rule represents a moral as well as a legal condemnation of such egregious and unequivocal conduct for which sanctions are imposed against the government as punishment regardless of the defendant's guilt. 518 F.2d at 637.

The government asserts that Trammel was not placed in the cell as an informant. Attorney John Gill, one of the prosecutors in the case, prepared an affidavit stating that Trammel requested that he be treated the same as the other defendants in order to protect his identity as an informant. Mr. Gill further stated that Trammel was jailed along with the other defendants solely for security reasons. He stated that he personally told Trammel that he did not want Trammel to tell him or any other Assistant United States Attorney of any conversation that he may have overheard while in custody. DEA agents were also instructed not to ask Trammel about any matters he may have overheard while in custody.

Mr. Gill further stated that the government's evidence in the case did not consist of any conversation Trammel may have overheard while in custody with the other co-defendants, nor was there any evidence derived from any such conversations. Finally, he stated that the government had no knowledge of any discussion of trial tactics, discussion of investigations, statements of defendants to counsel, or statements of legal advice to defendants.

In denying appellant's motion to dismiss and suppress, the trial judge relied upon the affidavit of Mr. Gill, and found there was no violation of the Sixth Amendment. He also found there was no tainted evidence in the case, no communication of defense strategy to the prosecution, and no purposeful intrusion. Reliance on the affidavit was proper in deciding the motion. *United States v. Irwin,* 612 F.2d 1182, 1187 (9th Cir.1980); *see also, Bishop v. Rose,* 701 F.2d 1150, 1155 (6th Cir.1983). There was no evidence presented which showed that the presence of Trammel in the lock up was purposefully caused by the government in order to gain confidential, privileged information; that the government obtained directly or indirectly any evidence used at trial as a result of the encounter; that any information gained by Trammel was used in any manner to the substantial detriment of defendant; or that the details about defense trial preparations were learned by the government.

The appellants have failed to show any violation of the principles set forth in

*Weatherford,* and failed to show any prejudice from the alleged invasion of the defense camp by Trammel. We therefore find no basis for their assertion that they were denied effective assistance of counsel, due process, or a fair trial.

■ The appellants' contention that the defense camp was invaded by Charles Scott is also unsubstantiated. After the trial of this case, defense attorneys, along with the government prosecutors, learned that Charles Scott, an investigator for appellant Steele's attorney, had provided information to an FBI agent in another case. This information concerned a cocaine shipment scheduled to arrive in LaFayette, Georgia. Acting on this information, the FBI and DEA made an arrest at the airport. Defense attorneys filed a motion for a new trial on the grounds that Scott was a government informant, and since he had access to defense camp tactics, he possibly could have relayed them to the government. An evidentiary hearing was held, which established that Scott was not a source of information in the present case. Based on these findings, the district court properly found that the appellants' Sixth Amendment rights were not violated.

## B. INSUFFICIENCY OF EVIDENCE

■ Appellants' second contention is that the court erred in failing to grant Echols' motion for judgment of acquittal based on insufficiency of evidence. It is well-settled that an appellate court considers, after viewing the evidence in the light most favorable to the prosecution, that any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Stacy v. Love,* 679 F.2d 1209 (6th Cir.), *cert. denied,* 459 U.S. 1009, 103 S.Ct. 364, 74 L.Ed.2d 400 (1982).

■ The evidence introduced in this case is more than sufficient to support the guilty verdict. Echols was with defendant Warren at the Primeway Inn; he drove the Cadillac containing Warren and Trammel to locate the motor home; he obtained the room for himself and Warren at the Coachway Inn; and he, Warren and Trammel discussed methods of transporting drugs as they were standing in the parking lot of the Coachman Inn. These facts, when viewed in a light most favorable to the prosecution, show that the defendant was a willing participant in the conspiracy to transport drugs. This was more than sufficient evidence to support the guilty verdict.

## C. PREJUDICIAL STATEMENT

The appellants also assert that the trial court erred in denying their motion for a mistrial or severance after Warren's incarceration was mentioned before the jury. This assertion cannot be substantiated.

During cross-examination of government witness Trammel, he stated that Warren had served time in a South American jail. Counsel to Warren immediately moved for a mistrial or a severance. The court excused the jury, and further discussions were held on the matter. The court denied the motion, and the next morning gave the following instruction to the jury:

> Now, then the second thing is that late yesterday afternoon near the close there was a statement by this witness with regard to a previous incarceration of one of the defendants in Colombia. Now, first let me tell you, ladies and gentlemen, that that has absolutely nothing to do with this case and it is a well-recognized and essential principle of our law that we don't assign to a person a bad character or bad trait of character because of something that he may or may not have done in the past and let that carry-over as evidence of guilt of something that may or may not have happened at a later time.
>
> Does everyone understand that?
>
> I am sure that you do and I am sure you believe in that and I am sure that you will just disabuse your mind of anything you heard about that yesterday afternoon and we will proceed to try this case and each of these defendants on the evidence that the government may present in this case about this alleged offense and not allow anything else to influence your de-

cision and particularly that remark yesterday afternoon.

The court has explored it. I have made a determination that it was unintentional, it was inadvertent; and it was not intended to prejudice your minds in any way and I am asking you now if you feel that you can and will disabuse your minds of that remark and will not allow it to prejudice you in any way in your consideration of the facts and of the guilt or innocence of these accused.

Everybody who can do that raise your hand, would you, please.

The court observes for the record that all hands are raised.

 Evidence as to prior crimes committed by a defendant is generally inadmissible in attempting to establish guilt of a crime for which the defendant is on trial. Fed.R.Evid. 404(b). However, the general rule is that the subsequent striking of erroneously admitted evidence accompanied by a clear and positive instruction to the jury to disregard cures the error. *United States v. Wells,* 431 F.2d 432, 433 (6th Cir.), *cert. denied,* 400 U.S. 967, 91 S.Ct. 380, 27 L.Ed.2d 388 (1970). From the record, there is sufficient evidence that the district court gave a clear and positive instruction to the jury to disregard Trammel's statement. Therefore, the appellants' assertion that the district court erred in denying a mistrial is unfounded.

### D. PROBABLE CAUSE

The appellants also assert that they are entitled to a new trial due to the trial court's failure to grant Warren's motion to suppress evidence seized from his vehicle. We find this assertion unpersuasive. Warren asserts that his arrest and the search of his Cadillac were without probable cause. Therefore, the $400,000 found in a brown tote bag, and the .9mm semi-automatic weapon should be suppressed. The district court properly rejected these contentions, and found that the search of the car and the container was reasonable under the Fourth Amendment.

 Probable cause is defined in terms of facts and circumstances sufficient to warrant a reasonable and prudent man to believe that a suspect has committed or was committing a criminal offense. *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964); *United States v. Francis,* 646 F.2d 251, 259 (6th Cir.), *cert. denied,* 454 U.S. 1082, 102 S.Ct. 637, 70 L.Ed.2d 616 (1981). The record provides more than sufficient evidence to establish probable cause for the arrest of Warren. The officials were aware from the beginning of this episode that Trammel was to meet people for the purpose of transporting a controlled substance that was to be brought into the Knoxville area by plane. They also knew that Trammel was to transport the load of drugs to Florida. Once Trammel arrived at the Primeway Inn, the agents witnessed the following facts: the changing of motels late at night; phone calls from phone booths away from the motel room; the false statement made to the motel clerk that Warren and the others had just driven in from Ohio; the departure of Warren and Echols from the Coachman Inn in the middle of the night; the arrival at the motel of Jackie Scarborough, a known drug smuggler; the arrival again of Warren and Echols in the early morning hours; the arrival of Scarborough and his motor home and a blue van; the bulging green garbage bag carried by Michael Briggance from the blue van to Scarborough's motor home; the contacts between Warren and Scarborough at the motel; Warren's comments concerning the locked keys in the blue van; the transfer of the van to Warren, Trammel, Echols, and George; and finally the departure of the caravan toward Atlanta with Trammel, whom the DEA knew was hired to drive the load of controlled substances. These facts, taken in their totality, constitute more than sufficient evidence to support a finding of probable cause for the arrest of Warren. *See, e.g., United States v. Pope,* 561 F.2d 663 (6th Cir.1977); *United States v. Prince,* 548 F.2d 164 (6th Cir.1977).

The search and seizure of Warren's Cadillac can be sustained on two grounds. First, the search was incident to a valid

seizure under 21 U.S.C. § 881, and second, the search was valid under the automobile exception to the warrant requirement.

 Pursuant to the Drug Abuse Prevention and Control Act,[4] officials can seize a vehicle or other conveyance if there is probable cause to believe that the vehicle facilitated the transportation of controlled substances.[5] In the instant case, DEA agents announced to Warren immediately upon his arrest that his vehicle was being seized pursuant to 21 U.S.C. § 881. The seizure of the vehicle was incident to Warren's arrest. The seizing agents had probable cause to believe that the vehicle had been used or was intended to be used in violation of the Act; and that it had facilitated the transportation, sale, receipt, possession or concealment of controlled substances. Once a vehicle is validly seized for forfeiture, a subsequent search of it is lawful. *United States v. Hartman,* 627 F.2d 7, 9 (6th Cir.1980); *United States v. Kimak,* 624 F.2d 903 (9th Cir.1980).

The search of the brown tote bag containing the $400,000 is governed by *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). *Ross* held that where there is probable cause to conduct a warrantless search of a vehicle, the search properly includes containers and packages that may conceal the object of a search. *Ross,* 456 U.S. at 823, 102 S.Ct. at 2171. The record indicates that Warren went to the trunk of his car several times. This action provided an independent basis for the suspicion that the container in the car contained contraband or evidence. Additionally, at the time of the search the police had already discovered over 1200 pounds of cocaine in the blue van to which the Cadillac was inextricably linked. Based on these facts, the district court properly found that the search of the Cadillac, and the containers in the trunk, was reasonable and did not violate the Fourth Amendment.

 The search is also justified under the automobile exception to the warrant requirement. *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). As the court held in *Ross,* where officers legitimately stop an automobile and have probable cause to believe that contraband is concealed somewhere within, the officers may conduct a warrantless search of the vehicle, including compartments and containers within the vehicle. *Ross,* 456 U.S. at 825, 102 S.Ct. at 2172. In the present case, it is clear that once the cocaine was found in the van, and in conjunction with the facts previously cited, there

---

**4.** In enacting the Drug Abuse Prevention and Control Act, 21 U.S.C. § 801, Congress made the following findings and declarations:

(1) Many of the drugs included within this subchapter have a useful and legitimate medical purpose and are necessary to maintain the health and general welfare of the American people.

(2) The illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people....

**5.** Pursuant to 21 U.S.C. § 881:

(a) The following shall be subject to forfeiture to the United States and no property rights shall exist in them:

(1) All controlled substances which have been manufactured, distributed, dispensed, or acquired by in violation of this subchapter.

(2) All raw materials, products, and equipment of any kind which are used or intended for use, in manufacturing, compounding, processing, delivering, importing, or exporting any controlled substance in violation of this subchapter.

\* \* \* \* \* \*

(4) All conveyances, including aircraft, vehicles, or vessels, which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of property described in paragraph (1) or (2) ...

\* \* \* \* \* \*

(6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for the controlled substance in violation of this subchapter,

(b) ... Seizure without ... process may be made when—

(1) the seizure is incident to an arrest or a search under a search warrant or an inspection under an administrative warrant;

\* \* \* \* \* \*

(4) The Attorney General has probable cause to believe that the property has been used or is intended to be used in violation of this subchapter.

was more than sufficient evidence to find probable cause to stop and search the car. We therefore find that the arrest of Warren, and the search of his car, were supported by probable cause, and did not violate the Fourth Amendment.

### E. CONTENTIONS RAISED ON BEHALF OF SCARBOROUGH AND STEELE

██ Appellants Scarborough and Steele make several contentions which we will briefly address. Appellant Scarborough asserts that he is entitled to a new trial based upon the failure of the trial court to grant his motion to suppress evidence seized as a result of a warrantless search of his motor home. We find this assertion to be unpersuasive.

After the arrests of the co-defendants in Cleveland, Tennessee, Special Agent Tucker was instructed to return to the Coachman Inn in Loudon to arrest the persons who had remained there. These included Scarborough, Briggance, and several other persons. Because of the number of people, and the shortage of automobiles, it was decided to use the motor home to transport those arrested. The motor home was seized pursuant to 21 U.S.C. § 881, and Scarborough was to be transported in it to Cleveland. Tucker testified that FBI Agent Murphy had advised Scarborough of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Prior to transporting Scarborough, Agent Tucker, to assure his own safety, inquired as to the existence of any guns in the motor home. Scarborough indicated that there were guns in the motor home under the

driver's seat. Agent Tucker subsequently found two loaded .38 caliber pistols under the seat and seized them. Upon arriving at Cleveland, the motor home was impounded. Scarborough was then presented with, and signed a consent form, thereby permitting the government to search the motor home.

There were two searches of the motor home. The first search occurred at the Coachman Inn on July 11, 1982, when the two pistols were found. The second search was conducted after the motor home had been impounded. We address only the first search, since Scarborough signed a consent form for the second search. The district court found that Scarborough had invoked his right to counsel before agent Tucker inquired about the guns. Therefore, the court found that the guns were fruits of the poisonous tree under the doctrine of *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). However, the court further found that the guns did not have to be suppressed as they would have been discovered anyway under the "inevitable discovery doctrine".[6] We find that the district court properly decided that the guns should not be suppressed.

The search was done incident to an arrest and for the protection of Agent Tucker. We also note that the motor home was seized pursuant to 21 U.S.C. § 881. We have previously discussed a search incident to seizure under 21 U.S.C. § 881 in regards to Warren's Cadillac. We find that these same authorities apply to the search and seizure of Scarborough's motor home.

Scarborough raised numerous other issues including whether he was entitled to a new trial due to the court's failure to suppress

---

**6.** The "inevitable discovery doctrine" was suggested as an exception to the exclusionary doctrine by the Supreme Court in *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 *reh'g. denied,* 431 U.S. 925, 97 S.Ct. 2200, 53 L.Ed.2d 240 (1977). In *Brewer,* the Court, after holding that a violation of defendant's right to counsel precluded the use of statements by the defendant as to where the body of his murder victim could be found stated:

While neither Williams' incriminating statements themselves nor any testimony describing his having led the police to the victim's

body can constitutionally be admitted into evidence, evidence of where the body was found and of its condition might well be admissible on the theory that the body would have been discovered in any event, even had incriminating statements not been elicited from Williams.

In the event a retrial is instituted, it will be for the state courts in the first instance to determine whether particular items of evidence may be admitted. 430 U.S. at 407, n. 12, 97 S.Ct. at 1243, n. 12.

evidence seized from his motel room; and whether the court erred in allowing the introduction of firearms into evidence. We find these assertions to be without merit.

Appellant Leonard Steele, who was named only in Count I of the indictment which alleged the conspiracy, asserts that he was denied effective assistance of counsel in violation of his Sixth Amendment rights. This assertion is based on: (1) that his trial counsel ineffectively and unartfully brought out during cross-examination that Trammel had perjured himself to benefit Steele; and (2) that his trial counsel employed a paid government informant who failed to carry out investigative tasks. We find that these assertions cannot be substantiated.

This circuit has recognized that the measure of counsel's effectiveness is that of the ordinary practioner in the heat of trial. *Beasley v. United States,* 491 F.2d 687, 696 (6th Cir.1974). During cross-examination, appellant's counsel elicited from Trammel that he had committed perjury to benefit appellant Steele. Prior to this cross-examination, the trial court gave a cautionary instruction to the jury, indicating that the admission of perjury by Trammel was relevant only in the jury's consideration of his credibility. This cross-examination of Trammel falls within the area of trial tactics and strategy that should not be subjected to second guessing and hindsight by this Court. An attorney must be free to determine questions of trial strategy. *See Coco v. United States,* 569 F.2d 367, 371 (5th Cir.1978). Additionally, from the record it can be gleaned that the attorney was persistent in his representation of the appellant.

As to appellant's second assertion regarding Charles Scott, the government informant, we have addressed this previously in the opinion. The district court found that Scott did not communicate any information regarding this case to the FBI agent.

Accordingly, we affirm the decision of the district court in denying motions for new trials and judgment notwithstanding the verdict.