770 F.2d 167
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES OF AMERICA, PLAINTIFF-APPELLEE,
v.
SALVATOR GATI (84-3270), WILLIAM ARBELAEZ (84-3271), WILLIAM
BLANDON-GAVIRIA (84-3272), DEFENDANTS-APPELLANTS.
 NOS. 84-3270, 84-3271, 84-3272
 United States Court of Appeals, Sixth Circuit.
 7/11/85
 
 N.D.Ohio
 AFFIRMED
 ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO
 Before: MERRITT and WELLFORD, Circuit Judges; and SPIEGEL, District Judge.*
 MERRITT, Circuit Judge.
 
 
 1
 Defendants Salvatore Gati, William Blandon-Gaviria and William Abelaez appeal from a January 31, 1984, District Court jury verdict convicting them of conspiring to distribute and possession with intent to distribute cocaine in violation of 21 U.S.C. Secs. 841(a) and 846. The issues in this appeal arise from the fact that George Bitsko, originally a codefendant in this case, was an ex-FBI informant who passed information to the FBI while incarcerated with the other defendants and whose testimony was the main evidence linking the defendants with the drug conspiracy. The defendants contend that the District Court abused its discretion in failing to hold a hearing to determine Bitsko's identity as the anonymous informant described in an in camera informant disclosure document filed by the U.S. Attorney, that they were denied their right to a fair trial and effective assistance of counsel because Bitsko testified against them and revealed confidential attorney-client communications to the prosecution, and that the District Court was clearly erroneous in finding that the U.S. Attorney did not intentionally goad them into moving for a mistrial upon discovering that Bitsko had agreed to testify for the prosecution. We find that all of these contentions are without merit, and therefore affirm the defendants' convictions.
 
 I.
 
 2
 The events giving rise to these convictions occurred on June 8 and 9, 1983. Government informant Clarence Greathouse told FBI undercover agent Hardrick Crawford that Michael Morrissey had a 'large scale' Columbian cocaine connection. At the trial in January, 1984, Crawford testified that he and Greathouse went to Morrissey's home on the eventing of June 8, 1983, ostensibly to buy a large quantity of cocaine. Morrissey told them that the cocaine would be brought by two 'mules' or drug runners, but that in the future Greathouse and Crawford could go directly to the 'big man,' who Morrissey knew through his work at the racetrack and who was from the Cleveland area and was in fact in Cleveland at that time. A. 55.[1]
 
 
 3
 At approximately 2:00 A.M., George Bitsko and Norman Bowman arrived at Morrissey's home carrying a quarter kilogram of cocaine. After the cocaine was tested for purity, an argument arose over the promised quantity of cocaine, and Bowman and Bitsko eventually left with the cocaine after arranging to meet Crawford and Greathouse the next afternoon to negotiate a four kilogram purchase. Bowman and Bitsko drove off in a brown Cadillac which was registered to Sal Gati Stables. A. 64-67.
 
 
 4
 At the meeting the next afternoon, a one kilogram sample buy was agreed to, and scheduled for that evening in the parking lot of a local Bob Evans restaurant. FBI surveillance personnel testified that Bowman and Bitsko returned to the home of Salvatore Gati's ex-wife, met with defendants Blandon-Gaviria and Abelaez, and that after Abelaez carried a light plastic bag into the home, Bowman and Bitsko placed the bag in the trunk of the Cadillac and left at approximately ten o'clock driving the Cadillac. A. 260-90.
 
 
 5
 Bowman and Bitsko were stopped and arrested just before they reached the Bob Evans restaurant, and a kilogram of cocaine was found in a yellow plastic bag in the trunk of the Cadillac. Simultaneously with these arrests, search warrants were executed on the residences of Morrissey and Gati's ex-wife, and defendants Gati, Abelaez, and Blandon-Gaviria as well as several bags containing cocaine and cash were found in Gati's ex-wife's home. A. 312-328. In total, roughly four kilograms of cocaine were found in the car and the home, of a purity exceeding 90 per cent, with an estimated street value in excess of one million dollars. A. 334-37.
 
 
 6
 The primary evidence linking the defendants to the drug conspiracy was the testimony of Bitsko. He testified that about a week before the arrests, Gati asked him if he wanted to work for Gati in his cocaine business, and that on Tuesday, June 7, when Abelaez and Blandon-Gaviria arrived at Gati's ex-wife's home, Gati became agitated, quickly hid cocaine that Bitsko, Gati and Bitsko's wife had been 'free-basing,' and told Bitsko and his wife that they should pose as interested drug buyers when they met Abelaez and Blandon-Gaviria. A. 112-22. On that same day, Bitsko accompanied Gati and Abelaez as they drove to collect money owed on a cocaine deal, and said that they stopped at a restaurant for Abelaez to make a phone call and at a residence where Abelaez returned with a plastic bag. A. 122-127.
 
 
 7
 Bitsko also testified that on the evening of June 8, Gati asked him and Bowman to take a quarter kilogram of cocaine to Morrissey's home to show to some potential buyers, A. 129, that the deal was discussed by all the defendants, and that the yellow bag with one kilogram of cocaine was given to them by Gati and Abelaez, who brought it from somewhere within Gati's ex-wife's home. A. 155-59. Gati's ex-wife testified that Abelaez and Blandon-Gaviria arrived at her home on June 7, two days before the arrests, and that all the defendants stayed at her home during the period in question. A. 367-376.
 
 
 8
 Bitsko had been a paid FBI informant since November 30, 1980, and was terminated as an informant only when, to their mutual surprise, he and his contact agent, David Drabb, encountered each other in the arrest on June 9, 1983. When the arrests were made, Drabb told the other agents that Bitsko was his informant and Drabb accompanied Bitsko on the drive back. After Bitsko was read his Miranda rights, Drabb castigated Bitsko for 'screwing up' and violating the conditions of his informant agreement (i.e. committing a crime) and Bitsko admitted that there was one kilogram of cocaine in the trunk of the seized automobile. Drabb told Bitsko that the FBI was as of that moment cutting him off as an informant and that he was 'on his own' as far as his present arrest was concerned. After the arrest, Bitsko no longer received informant money and no longer met regularly with Drabb.
 
 
 9
 Although he had told Drabb that Gati was involved with cocaine distribution two months before the arrests, A. 166, Bitsko did not provide any information which led to the events of June 8 and 9. However, after he was jailed with the other defendants, Bitsko soon initiated informal contacts with Drabb in which he passed information regarding the other defendants in an effort to negotiate a reduced sentence for himself. During June 1983, Bitsko told Drabb that the big brother of the Columbia defendants Abelaez and Blandon-Gaviria had arrived in Cleveland, and that this big brother was the 'main man' in narcotics and had come to post bond for Abelaez; that Abelaez and Blandon-Gaviria were using false names; that Blandon-Gaviria was a bigamist and that Abelaez was married to a woman in Florida who was then five months pregnant; and that defendant Gati had arranged for Bowman and defendant Abelaez to drive with the cocaine from Florida, and they left approximately on Memorial Day accompanied by a woman and child as cover, and the woman eventually filed kidnapping charges against them. A. 464-73. He also told Drabb about other drug dealers in the Cleveland area who were supplied by Gati. A. 474-78.
 
 
 10
 Bitsko apparently provided no further information regarding the defendants during the summer of 1983. Drabb stated that he informed the U.S. Attorney 'early on' in the summer that Bitsko was seeking to make a deal, A. 478-79, but that although he relayed the information to his supervisor in the FBI, he did not inform the U.S. Attorney that Bitsko had been an informant of his and he did not tell the U.S. Attorney about his conversations with Bitsko. It was also clear that Drabb's contracts with Bitsko occurred outside the presence of Bitsko's attorney. A. 490-503.
 
 
 11
 Trial begain in July, 1983, with Bitsko still a defendant. In August, the defendants moved to have the government disclose the names of any informants. The U.S. Attorney asked the FBI what if any information had been provided by any informants and was told for the first time about Bitsko's conversations and also told that Bitsko had provided information indicating that Gati was involved in drug trafficking but had not provided any information relating to this case. A. 580-88.
 
 
 12
 On August 17, the government responded to the defendants' motion to disclose informants by filing a sealed document informing the court that one defendant had been an informant in the past but had not been supplying information since his arrest and had been closed out as an informant. In pertinent part, that document stated:
 
 
 13
 . . . one of the defendants in this case (hereinafter referred to as the informant) has served as a confidential informant for the Federal Bureau of Investigation in the past, and that on one occasion during the early months of this year supplied the F.B.I. with information to the effect that Defendant Gati was involved with the illicit distribution of drugs. The bulk of the information supplied by the informant dealt with other matters unrelated to this case.
 
 
 14
 * * *
 
 
 15
 * * *
 
 
 16
 The F.B.I. agent responsible for handling the informant advises that the informant was not acting in an undercover capacity for the F.B.I. during any of the transactions resulting in the arrest made in this case, nor did the informant supply any information to Federal agents concerning any of the defendants during the events which are the subject of this indictment. The F.B.I. agent further advises that the informant has not supplied the Bureau with any information concerning the subject of the indictment or any other defendants since his arrest, and that he has been closed out as an F.B.I. informant.
 
 
 17
 * * *
 
 
 18
 * * *
 
 
 19
 Under the facts of this case, the informant was, for purposes of considering defendants' motion for disclosure, not functioning as a Government informant, but merely as a coconspirator acting on his own behalf independent of any relationship with the F.B.I. The disclosure of his identity as a former informant, essentially for matters pertaining to other than the facts of this case, would not be helpful to the defense or essential for a fair trial. Such disclosure, on the other hand, could compromise F.B.I. intelligence capabilities and almost certainly endanger the personal well-being of the informant himself.
 
 
 20
 Without holding a hearing, the court ruled on the basis of the above sealed document that there had been no showing of the necessity for disclosure of the informant's name. A. 593.
 
 
 21
 After the above in camera disclosure, negotiations with Bitsko's lawyer proceeded and on September 1, 1983, Bitsko pleaded guilty to one count of possession with intent to distribute cocaine in exchange for his agreement to testify for the prosecution.[2] The defendants moved for a mistrial on the ground that Bitsko's appearance first as a defendant and then as a witness would destroy the presumption of innocence to which the remaining defendants were constitutionally entitled, and on the additional grounds that Bitsko had been privy to defense strategy sessions and had affected jury selection. On September 13, 1983, a hearing was held, and after the prosecution stated that it did not oppose the mistrial motion, the District Court entered an order declaring a mistrial and dismissing the jury. A. 610-11.
 
 
 22
 The defendants then moved to voir dire Bitsko to determine if he had provided information to the government while incarcerated with the other defendants. On September 20, 1983, at the outset of the hearing on this motion, the District Court for the first time revealed the August 17 in camera informant disclosure statement, and also revealed a letter it had received from the U.S. Attorney on September 20 in which the U.S. Attorney stated that on September 19, the previous day, he had been told for the first time that Bitsko had provided substantive information relating to the investigation.
 
 
 23
 The defendants moved to dismiss the indictments on the grounds that further prosecution would violate the constitutional prohibition against double jeopardy and that the defendants' right to a fair trial and effective assistance of counsel had been violated by Bitsko's invasion of defense lawyer-client relationships. On September 23, the District Court found that there was no double jeopardy because the prosecutor had not intended to goad the defendants into moving for a mistrial, and that although it was 'bad practice' for FBI agent Drabb to allow Bitsko to be incarcerated with the other defendants, the government had not inserted Bitsko into the defense camp in an attempt to discover defense strategy, and the defendants had not carried their burden of showing that Bitsko had delivered strategic information or any other information that would be used at trial. A. 614-23. The court stated that it would exclude any testimony by Bitsko based on conversations he had while incarcerated with the other defendants, and retained the authority to dismiss the indictment if events during trial showed that the government had in fact learned of the defendants' strategy. A. 618-19. The court therefore denied the motion to dismiss.
 
 
 24
 After this court denied defendants' application for a writ of prohibition ordering the District Court to certify an interlocutory appeal on the double jeopardy issue, No. 83-3668, October 12, 1983, trial began in January, 1984, and concluded that same month when the jury handed down verdicts finding the defendants guilty on all counts.
 
 II.
 A.
 
 25
 The defendants assert first that the District Court abused its discretion in failing to hold a hearing on August 17, 1983, to inquire into Bitsko's status after being notified in the in camera informant disclosure that one of the defendants had been an informant and had produced some general information regarding one of the defendants some months earlier but was not relaying any information regarding the instant charges.
 
 
 26
 While the U.S. Attorney later discovered that the statement that Bitsko was not passing information about the present case was in fact false, the government argues that the disclosure did not give the court notice of any possible invasion of the defense camp and that the trial court was entitled to rely on the U.S. Attorney's representations. Moreover, the government contends, when the U.S. Attorney later learned that information had been disclosed after Bitsko's arrest, he immediately informed the court and a hearing was held to determine what Bitsko had told agent Drabb, so that the defendants were not prejudiced by the failure to hold a hearing on August 17.
 
 
 27
 We agree with the government's view that the defendants suffered no prejudice from the District Court's failure to hold a hearing, and that the hearing would have served very little purpose. This court has stated that a discretionary action should only be set aside when the reviewing court has 'a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors.' Taylor v. United States Parole Commission, 734 F.2d 1152, 1155 (6th Cir. 1984). We find that the District Court did not commit an error of judgment in failing to hold a hearing, and refuse therefore to reverse the defendants' convictions on this ground.
 
 B.
 
 28
 Defendants next contend that they were denied a fair trial and effective assistance of counsel in violation of the Sixth Amendment due to the invasion of the defense camp by Bitsko, who was privy to attorney-client communications and defense strategies and who conveyed information about the present case to the prosecution.
 
 
 29
 In Weatherford v. Bursey, 429 U.S. 545 (1977), the Supreme Court rejected an approach under which there is a per se violation of the defendant's right to counsel whenever an undercover agent or informant meets with a criminal defendant and discusses the defendant's upcoming trial without revealing his identity as an agent or informer. Instead, the Court ruled that when 'conversations with counsel have been overheard, the constitutionality of the conviction depends on whether the overheard conversations have produced, directly or indirectly, any of the evidence offered at trial,' 429 U.S. at 552, and found no violation of the Sixth Amendment where there was no tainted evidence, no communication of defense strategy to the prosecution, and no purposeful planting of a spy-informant. 429 U.S. at 558.
 
 
 30
 In United States v. Steele, 727 F.2d 580 (6th Cir.), cert. denied, ---- U.S. ----, 104 S.Ct. 2396 (1984), this court enunciated four factors to look to in determining whether there has been an invasion of the right to effective assistance of counsel: (1) whether the presence of the informant was purposely caused by the government in order to garner confidential, privileged information, or whether the presence of the informant was the result of other inadvertent occurrences; (2) whether the government obtained, directly or indirectly, any evidence which was used at trial as the result of the informant's intrusion; (3) whether any information gained by the informant's intrusion was used in any other manner to the substantial detriment of the defendant; and (4) whether the details about trial preparations were learned by the government. 727 F.2d at 585. Under the pragmatic approach adopted in Steele, the defendants' Sixth Amendment rights were not violated because Bitsko's presence among the other defendants was inadvertent rather than planned by the government, because essentially none of the information he acquired after his arrest was used in the trial, and because the defendants cannot identify any significant detail of their trial preparation which was revealed to the U.S. Attorney. There is nothing in the record to indicate that the defendants' ability to defend themselves or the course of the trial was affected by Bitsko's information. The appropriate sanction for agent Drabb's misconduct was the exclusion of evidence produced by Bitsko after his incarceration, not dismissal of the indictment. See United States v. Boulhanis, 677 F.2d 586, 588 (7th Cir. 1982) (severance and suppression of the informant's statements sufficed to preserve fair trial).
 
 C.
 
 31
 In Oregon v. Kennedy, 456 U.S. 667, 676 (1982), the Court held that '[o]nly where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion' (relying on language from United States v. Dinitz, 424 U.S. 600, 611 (1976)). The Court explicitly stated in Oregon v. Kennedy that the standard for prosecutorial misconduct 'merely calls for the court to make a finding of fact. Inferring the existence or nonexistence of intent from objective facts and circumstances is a familiar process in our criminal justice system.' Id. To this extent, therefore, the District Court's finding that the government did not intend to goad the defendants into moving for a mistrial is a factual finding subject to the clearly erroneous standard of review. United States v. Jabara, 644 F.2d 574, 577 (6th Cir. 1981).
 
 
 32
 The defendants' theory is that Bitsko's sudden and rather late removal as a defendant and appearance as a witness forced the defendants into moving for a mistrial, and that the prosecutor's motive in so coercing the defendants was to ensure that Bitsko's testimony would be admissible. This theory rests on the totally mistaken premise that Bitsko could not testify before the first jury without violating the defendants' constitutional rights. Indeed, a simple curative instruction to the first jury may well have been a better, more efficient solution than a mistrial to the problems posed by Bitsko's appearance as witness. See United States v. Boley, 730 F.2d 1326, 1333 (10th Cir. 1984); United States v. Cartwright, 528 F.2d 168, 175-76 (7th Cir. 1975). There is no direct evidence that the prosecutor intentionally goaded the defendants into moving for a mistrial, and this inferential theory is simply groundless.
 
 
 33
 Accordingly, the decision of the District Court is affirmed.
 
 
 
 *
 The Honorable S. Arthur Spiegel, Judge of the United States District Court for the Southern District of Ohio, sitting by designation
 
 
 [1]
 'A' refers to the Joint Appendix on Appeal
 
 
 [2]
 Under the terms of the agreement to testify, two of the three drug charges against Bitsko were dropped, as was an unrelated federal gun charge, and the government agreed to a two year sentence for the drug charge and to enter Bitsko and his common law wife in the Federal Witness Protection Program. A. 166-70