RENDERED: OCTOBER 31, 2019
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2018-SC-0000056-MR

FINAL

DATE 11/25/19 JAF

BENJAMIN DWAYNE WARD                                    APPELLANT

ON APPEAL FROM BOONE CIRCUIT COURT
V.        HONORABLE JAMES ROGER SCHRAND II, JUDGE
NO. 16-CR-00044

COMMONWEALTH OF KENTUCKY                                APPELLEE

**OPINION OF THE COURT BY CHIEF JUSTICE MINTON**

**REVERSING AND REMANDING**

A Boone County jury found Benjamin Dwayne Ward guilty of three counts of first-degree sexual abuse, two counts of third-degree rape, four counts of third-degree sodomy, one count of use of a minor in a sexual performance, and two counts of possession of matter portraying a sexual performance by a minor. For these crimes, Ward was sentenced to 70 years' imprisonment. Ward now appeals the resulting judgment as a matter of right,[1] raising several allegations of trial court error. Finding that the trial court erred by not striking one of the jurors for cause, Ward's conviction must be reversed.

---

[1] Ky. Const. § 110(2)(b) ("Appeals from a judgment of the Circuit Court imposing a sentence of . . . imprisonment for twenty years or more shall be taken directly to the Supreme Court.").

# I. BACKGROUND.

The victim moved in with her father when she was eight years old after her parents divorced. The victim, her siblings, her father, and her step-mother lived together near Ward and his wife, Cindy. The families became friends and often spent time together.

When the victim was around 11 or 12 years old, she began spending more time at the Wards' house, usually without her siblings. The Wards were truck drivers and spent much of their time away from home. But when the Wards were home, the victim was frequently there with them.

Initially, Ward behaved as a father figure toward the victim, but his attraction to her became sexual. Ward began to embrace her and touch her and refer to her as "his little girlfriend."

Ward bought the victim gifts, including a pair of expensive boots, jewelry, and clothes, and gave her a credit card. Ward devised a scheme to give gifts to the victim without Cindy's knowledge. To that end, Ward would leave the gifts in his truck and inform the victim he had left a gift for her. The victim would then sneak out at night and retrieve them.

The first instance of sexual touching occurred when the victim was about 11-years-old. Ward started rubbing the victim's pants, which led to him using his hand to rub the victim's vagina over her pants. Ward also kissed the victim on the lips and touched her breasts and buttocks. Another instance of sexual touching occurred in Ward's pickup truck. Ward would often pick the victim up a few streets away from their houses and drive her to school. On one occasion in the truck, Ward rubbed the victim's vagina with his hand, then started kissing her, which led to him almost driving off the road. Yet another instance

2

of sexual touching occurred when the victim was sitting on Ward's lap in a computer chair, where he rubbed the victim's vagina over her pants.

The first time Ward had sexual intercourse with the victim was when they were in a room in the Ward residence called the "bat cave." The victim was between 12 and 14-years-old at the time. Ward asked for sex, and the victim replied, "You're my boyfriend. Sure." Ward then engaged in sexual intercourse with the victim, but he stopped after she began crying because of the pain. The second time Ward had intercourse with the victim was when they were in Ward's basement. The victim testified that she was about 13-years-old at this time. Again, Ward stopped engaging in intercourse with her after she started crying because of the pain.

Ward also caused the victim to perform oral sex on him. One instance occurred in the "bat cave" when the victim was either 13 or 14-years-old. Another instance occurred either in the "bat cave" or in the basement of the Ward residence. A third instance occurred outside after Ward asked the victim to sneak outside and meet him, which she did after Ward begged for an hour.

Ward and the victim often engaged in sexting. On one occasion, Ward told the victim that he was upset about something and needed the victim to cheer him up, asking the victim to send him nude photos. The victim complied and sent him four nude photos.

Cindy eventually suspected impropriety between Ward and the victim. Cindy began to find the victim alone with Ward in the Ward residence. On one occasion, Cindy found the victim clad only in her underwear asleep on the futon in the "bat cave." Cindy eventually learned of the gifts Ward had been leaving for the victim in his truck.

The victim's father and step-mother discovered a letter written by her that claimed she was in a romantic relationship with Ward. That same month, the Northern Kentucky Children's Advocacy Center interviewed the victim. She told the advocacy center that she and Ward were engaged in a "romantic relationship" and that they would communicate via Facebook. During the interview, the victim explicitly and repeatedly denied any physical contact or sexual activity with Ward. The victim also stated that she had written the letter because she was angry at Ward for not buying her an iPad. Following a second interview, the sheriff's department determined that the victim was "out of control" because of her tumultuous family situation but insufficient evidence was available to proceed with a criminal investigation.

Soon thereafter, Cindy received a sexually explicit text message from Ward that was intended for the victim. In the text message, Ward communicated his desire to perform oral sex on the victim. When confronted, Ward and the victim both claimed that they had never engaged in a sexual act together.

One night, while Ward and Cindy were watching a movie in the "bat cave," Cindy turned to see Ward looking at his phone. Cindy then noticed Ward squirming in his seat and rubbing his penis. When Cindy viewed Ward's phone, she became aware that Ward was engaged in a live video chat with the victim in which the victim was nude and displaying her genitals.

Cindy called the sheriff, stating that she had just witnessed her husband watching on his phone a live video of a naked minor. Cindy provided the officers with several pieces of paper that she had found in the trash containing sexually explicit drawings and references to the victim, presumably created by

4

Ward. The victim testified that Ward used these drawings to communicate silent sexual conversations with her and give her directions over video. After Cindy's report, the sheriff's department arranged for Cindy to attempt a recorded, controlled phone call with Ward.

During the call, Cindy repeatedly asked Ward for details on the live-stream video incident she witnessed and for details of his relationship with the victim. Ward stated that the victim approached him and that they had engaged in sexting. As the call with Cindy continued, the couple argued, with Cindy making accusations and Ward issuing repeated denials. Ward stated he was going to set the house on fire, to which the sheriff's department responded by sending two officers to secure the residence.

Following the officers' securing and searching the residence, one of the officers interviewed the victim. The victim stated that she and Ward had sexted several times, but she denied any physical, sexual contact between them. Following this interview, investigators took no further action for six months while waiting on a full analysis of all electronic devices seized during the search of the Ward residence.

Finally, the victim had a third interview with the Northern Kentucky Children's Advocacy Center. The victim said that she was in a "healthy, normal relationship" with a young man her own age who encouraged her to tell her full story. The victim then admitted that she and Ward had engaged in sexual acts together. The victim described how the relationship began when she was around 11 years old and continued until she was 15 years old. The victim said that she had become infatuated with Ward and considered him her boyfriend.

She then described the events recounted above. Based on this interview, the Commonwealth brought charges against Ward that led to his indictment.

At trial, the jury found Ward guilty of three counts of first-degree sexual abuse, two counts of third-degree rape, four counts of third-degree sodomy, one count of use of a minor in a sexual performance, and two counts of possession of matter portraying a sexual performance by a minor. For these convictions, Ward was sentenced to a total of 70 years' imprisonment. And the trial court entered judgment accordingly. This appeal followed.

## II. ANALYSIS.

### A. The trial court did not err in denying Ward's motion to dismiss the indictment or, in the alternative, to disqualify the Commonwealth Attorney's Office and Sheriff's Department.

#### 1. Ward's recorded phone calls from jail included privileged attorney-client communications.

Ward first challenges as error the trial court's denial of his motion to disqualify the Office of the Commonwealth's Attorney for the 54th Judicial Circuit and the Boone County Sheriff's Department for violating his right to privileged attorney-client communication. The background for this motion was the fact that the Commonwealth's Attorney's office and the sheriff's office reviewed recordings of all telephone calls Ward made from the jail while incarcerated pretrial. The basis for this motion was the fact that among those recordings were several conversations about trial strategy between Ward and his defense counsel. This issue is preserved for our review.

6

"Any prosecuting attorney may be disqualified by the court . . . upon a showing of actual prejudice."[2] We review a trial court's denial of a defendant's motion to disqualify a prosecutor for abuse of discretion.[3] "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[4]

Ward moved to disqualify the Commonwealth's Attorney's Office and the Boone County Sheriff's Office after he received from the Commonwealth through pretrial discovery recordings of telephone calls Ward made from jail over a 20 to 21-month period of pretrial incarceration. Contained within those recorded calls were 48 recorded calls between Ward and his defense counsel. Because the Commonwealth's Attorney and the Sheriff's Department were in possession of these recordings containing privileged attorney-client communications, Ward argued, both entities should be disqualified from prosecuting the case. Ward proposed a remedy of new prosecution and law enforcement investigators to ensure that his Sixth Amendment right to counsel would not be violated.

The trial court conducted an initial hearing in response to Ward's motion. Defense counsel explained that included in the 48 phone calls was substantive communication between Ward and defense counsel regarding trial strategy and witnesses, although defense counsel acknowledged that he had no evidence that the Commonwealth listened to any of the recorded calls.

---

[2] KRS 15.733(3).

[3] *Calhoun v. Commonwealth*, 492 S.W.3d 132, 138 (Ky. 2016) ("The trial court did not abuse its discretion in allowing the prosecution to proceed.").

[4] *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000) (citing *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999)).

Assistant Commonwealth's Attorney Corey Gamm responded that to prepare for trial he routinely subpoenas the recordings of a defendant's incoming and outgoing jail calls. Gamm then explained, "In cases where there are attorney calls . . . we don't listen to them. . . . As long as I've been doing this that's how we've always done it." Gamm stated that he had not listened to any of the calls between Ward and defense counsel because "that's just not what we do." Another prosecutor explained that both parties to a jail call receive a recorded message stating that the call is being recorded, but defense counsel responded to that assertion by stating that the message also includes an assurance that attorney-client conversations are not recorded.[5] Finally, Gamm stated that while listening to Ward's calls, if he happened across a call between Ward and defense counsel, he skipped that call.

Clearly concerned about the potential breach of confidential attorney-client communication, the trial court held a second hearing a couple of weeks later. At this hearing, defense counsel called Gamm to testify under oath. Gamm began his testimony by explaining that, as a rule, he files in the record the subpoena of the inmate's telephone record, but he did not do so in the present case because he forgot to do so.[6] Gamm admitted that he did not give defense counsel notice of the issuance of the subpoena.

---

[5] As revealed by testimony at a second hearing, theses calls do, in fact, contain a message excepting attorney-client calls from being subject to recording.

[6] Testimony provided at the hearing revealed that the jail contracts with a private-sector communications company for phone services for jail inmates. For this reason, the Commonwealth needed a subpoena directed to that company to obtain its phone records.

Gamm then testified that he received the calls sometime in March. He placed the discs containing the calls in an office file and did not listen to them until August. Gamm sent a message to defense counsel on August 16 and made a copy of the discs, which defense counsel obtained. Gamm testified that he had not listened to any of Ward's phone calls at that point in time.

When Gamm began the process of listening to the phone calls, he encountered such a high volume of calls that he assigned listening duties of one of the discs to Detective Parker of the Boone County Sheriff's Department. Gamm played the recording of the calls "in the background while [he] was working on other things." Gamm stated, "I can't tell you how far I got into it, but at one point I did realize there was a call between Mr. Ward and [defense counsel]." Gamm could not pinpoint a specific day or time when he encountered that call, but he thought that it was either "several days or a couple weeks" after August 16.

Defense counsel then asked Gamm, "So you listened to a conversation between Mr. Ward and [defense counsel]?" Gamm stated that he listened to no more than ten seconds of the call and stopped listening when he realized he was hearing a conversation between Ward and defense counsel. Defense counsel then asked Gamm whether he had received jail-call recordings in the past with attorney-client conversations on them, to which Gamm responded that he had never heard an attorney-client call when listening to recorded jail calls before. Gamm also stated that the possibility of hearing attorney-client conversations on recorded jail calls had never occurred to him.

Defense counsel then asked what action Gamm took after realizing that the Commonwealth was in possession of privileged attorney-client

9

communications. Gamm responded by stating that he assumed that a mistake had been made. He assumed that whatever system was in place to screen that kind of conversation had failed with respect to that conversation. Gamm testified that he thought, "not a big deal." He stopped listening to that call and only listened to a few more calls because the recordings were not divulging information that would help his case. Gamm admitted that he should have notified someone immediately when he heard the call to defense counsel, that he did not give such notice, and that he wished he had. Gamm then testified that he did not hear any privileged attorney-client communications other than the ten seconds of the one call about which he testified.

Defense counsel then asked whether Gamm took any action to purge the information from his office. Gamm had not. After defense counsel filed the motion to disqualify, Gamm also asked Detective Parker to return the disc to him.

During examination by the Commonwealth, Gamm backed away from his statement made at the prior hearing that "attorney-client calls are frequently contained in the recordings." Gamm explained that his earlier statement came from speaking with administrative personnel about another case that involved this issue.

Detective Parker testified at the second hearing that she received two discs from Gamm containing recorded phone calls. She testified that she did not hear any conversations between Ward and defense counsel, and, in fact, she listened to a small number of the total calls in general—she only heard conversations between Ward and his mother and sister and between Ward and a man she did not know but whom she believed to be another inmate. While

10

Detective Parker testified that she never heard defense counsel's voice in any of the phone calls she listened to, she did admit that she would have no way of knowing whether the call she was listening to was between Ward and defense counsel without Ward identifying defense counsel by name. She also testified that she was not sure about the total number of phone calls to which she listened.

## 2. Despite the Commonwealth's possession of recordings of privileged conversations, no Sixth Amendment violation occurred; and trial court did not abuse its discretion by declining to disqualify the prosecutor and the sheriff's department.

Ward argues that his Sixth Amendment right to counsel was violated when the trial court denied his motion to disqualify the Commonwealth's Attorney's Office and the Sheriff's Department. The facts here are troublesome, but we conclude that the trial court did not abuse its discretion in denying Ward's disqualification motion because no Sixth Amendment violation occurred here.

We dealt with the Commonwealth's possession of privileged attorney-client material in *Brown v. Commonwealth*.[7] The issue in *Brown* was "[w]hether the seizure of privileged material from a defendant's jail cell violates that person's right to counsel[.]"[8] In concluding that the defendant's Sixth Amendment right to counsel had not been violated, we began our analysis by examining the U.S. Supreme Court's decision in *Weatherford v. Bursey*[9] on this

---

[7] 416 S.W.3d 302 (Ky. 2013).

[8] *Id.* at 306.

[9] 429 U.S. 545 (1977).

11

issue.[10] In *Weatherford,* an undercover law enforcement agent accidentally learned of attorney-client privileged information while working undercover.[11] The U.S. Supreme Court found no violation of the defendant's Sixth Amendment right to counsel because the intrusion was accidental and because the undercover agent did not disclose any of the information gathered to the prosecution.[12]

In *Brown,* we also recognized the Sixth Circuit's decision in *U.S. v. Steele*[13] as providing guidance on this issue.[14] Specifically, the Sixth Circuit in *Steele* listed the following four factors to consider when determining whether the government has violated a defendant's Sixth Amendment right to counsel:

1) whether the presence of the informant was purposely caused by the government in order to garner confidential, privileged information, or whether the presence of the informant was the result of other inadvertent occurrences;

2) whether the government obtained, directly or indirectly, any evidence which was used at trial as the result of the informant's intrusion;

3) whether any information gained by the informant's intrusion was used in any other manner to the substantial detriment of the defendant; and

4) whether the details about trial preparations were learned by the government.[15]

In this case, the "informant" is the third-party company that records jail calls through which the Commonwealth can obtain recordings of those calls by

---

[10] *Brown,* 416 S.W.3d at 306.

[11] *Weatherford,* 429 U.S. at 547–58.

[12] *Id.*

[13] 727 F.2d 580 (6th Cir. 1984).

[14] *Brown,* 416 S.W.3d at 306.

[15] *Id.* (quoting *Steele,* 727 F.2d at 585).

12

subpoenaing the records in the hands of the company. The weight of the evidence adduced at the hearings before the trial court supports the conclusion that an inmate's incoming or outgoing telephone calls are recorded for several reasons not considered improper government conduct—reasons like preventing an inmate from committing additional crimes either inside or outside the jail or discovering when an inmate might instruct individuals on the outside to destroy potentially incriminating evidence. The weight of the evidence supports the additional conclusion that the Commonwealth obtains recorded jail calls to gather information helpful to the defendant's prosecution.

The weight of the evidence presented to the trial court does not support the conclusion that the Commonwealth obtains a defendant's incoming and outgoing jail calls to receive privileged communications between an inmate and his or her attorney. And Ward does not identify any specific trial evidence that the Commonwealth obtained through these recorded conversations or any evidence that could not have been obtained outside of the Commonwealth's learning of it through these calls.

Evaluation of the third and fourth *Brown* factors proves to be more difficult. There is no dispute that the Commonwealth was in possession of recordings of all the phone calls between Ward and defense counsel. Without revealing the content of the communications, we can say that the phone calls contain conversations between Ward and defense counsel about trial strategy. But Assistant Commonwealth's Attorney Gamm swore under oath that he only inadvertently heard around five to fifteen seconds of one conversation between Ward and defense counsel, while Detective Parker swore that she heard no

13

conversation between the two. Taking the witnesses at their word,[16] the issue then becomes whether mere possession of privileged attorney-client information by the state violates the Sixth Amendment. In this case, under these facts, we cannot find that to be the case.

Searching for case law from other jurisdictions to aid our analysis, the most analogous case we found is the unreported decision of the U.S. District Court for the District of Arizona in *U.S. v. Guzman-Solis*.[17] Just as in this case, the defendant sought to dismiss his case because the prosecution had recordings of jail phone calls, some of which included conversations between the defendant and his attorney.[18] Similar to the ratio of attorney-client conversations to the total number of calls at issue in the case at hand, the prosecution in *Guzman-Solis* had ten hours of recordings of jail telephone calls that included "approximately 45 minutes of privileged attorney-client conversations between counsel and Defendant, during which they discussed trial strategy."[19] The conversations between the defendant and his attorney

---

[16] Detective Parker did not appear to contradict herself in any way, but Attorney Gamm made contradictory statements in the second hearing that also contradicted statements he made in the first hearing, including: 1) at the first hearing he stated that it was the policy of the Commonwealth's Attorney's Office simply to skip over recorded attorney-client phone calls but recanted that statement at the second hearing; 2) at the first hearing, he stated that he had not listened to any of the privileged calls but admitted to having listened to the first ten seconds of one call in the second hearing; and 3) at the second hearing, he stated that he had to click on each phone call individually to be able to listen to it but then minutes later stated that the recordings played automatically. Even so, the credibility of witnesses is for the factfinder, here, the trial court, to determine, *see Morgan v. Commonwealth*, 421 S.W.3d 388, 393 (Ky. 2014), and we cannot say that the trial court abused its discretion in its ultimate decision.

[17] No. CR–14–01729–001–TUC–CKJ, 2015 WL 13283396, (D. Ariz. Oct. 19, 2015).

[18] *Id.* at *5.

[19] *Id.*

14

were in Spanish, so the prosecutor had a detective who spoke Spanish listen to the phone calls.[20] While the prosecutor never heard a conversation between the defendant and his attorney, the detective did hear the beginning of one conversation "but she stopped listening when she recognized the attorney's voice."[21]

The Court in *Guzman-Solis* began by examining the Ninth Circuit's decision in *U.S. v. Danielson*[22] for guidance.[23] The Court explained that in *Danielson*, "the prosecution team deliberately and affirmatively took steps[] that resulted in obtaining privileged information about Danielson's trial strategy."[24] The Court then specifically described the prosecution's actions in *Danielson*:

> Members of the prosecution team wrote and retained memoranda containing privileged trial strategy information, as well as recorded, listened to, transcribed, and retained the tapes and transcripts containing the privileged information. In addition, the Assistant United States Attorney in charge of the prosecution retained in his private office memoranda and unredacted transcripts containing the privileged information. None of this material was produced to Danielson or his counsel during pre-trial discovery.[25]

The Court then highlighted the holding in *Danielson*:

> The government's interference with Danielson's attorney-client relationship was neither accidental nor unavoidable, but was rather the result of deliberate and affirmative acts. We therefore hold that if there was prejudice there was a violation of the Sixth Amendment under *Weatherford*[.] . . . For a determination of prejudice, we rely on *United States v. Mastroianni*[26] and *Kastigar v.*

---

[20] *Id.*

[21] *Id.*

[22] 325 F.3d 1054 (9th Cir. 2003).

[23] *Guzman-Solis*, 2015 WL 13283396, at *5.

[24] *Id.* (citing *Danielson*, 325 F.3d at 1059).

[25] *Guzman-Solis*, 2015 WL 13283396 at *5 (quoting *Danielson*, 325 F.3d at 1059).

[26] 749 F.2d 900 (1st Cir. 1984).

> *United States*[27] to hold that the government has the "heavy burden" of proving non-use of Danielson's trial strategy information. We remand to the district court for an evidentiary hearing for a determination of prejudice under this case.[28]

The Court then dissected the analysis and holding of the *Danielson* Court.

"To prevail[,] . . . a defendant must first make a prima facie showing of prejudice."[29] "The *Danielson* court rejected a *per se* rule of prejudice; that is, mere possession by the prosecution of otherwise confidential trial strategy information does not establish prejudice."[30] "Rather, . . . the government informant must have acted affirmatively to intrude into the attorney-client relationship and thereby to obtain the privileged information."[31] "Other cases support the requirement that the government must act affirmatively to intrude into the attorney-client relationship."[32]

The *Guzman-Solis* Court then broke down the analysis that courts should conduct in this situation:

---

[27] 406 U.S. 441 (1972).

[28] *Guzman-Solis*, 2015 WL 13283396 at *5 (quoting *Danielson*, 325 F.3d at 1059).

[29] *Id.* (citing *Danielson*, 325 F.3d at 1071).

[30] *Id.*

[31] *Id.* (quoting *Danielson*, 325 F.3d at 1071).

[32] *Id.* (citing *U.S. v. Ramos*, No. CR 13–403–CAS, 2014 WL 8817652, at *4–5 (C.D. Cal. 2014); *Cooper v. Mayfi*, No. C 06–4872 MJJ (PR), 2008 WL 608336, at *13 (N.D. Cal. 2008)). In *Ramos*, the court declined to hold a *Danielson* hearing where the defendant had obtained a confidential informant file by subpoena from the Department of Homeland Security ("DHS") and the court ordered the DHS subpoena turned over to the case agent, who discussed the subpoena with the prosecution team, because there was no evidence that trial strategy had been revealed. *Ramos*, 2014 WL 8817652 at *4–5. In *Cooper*, documents had been seized from the defendant's jail cell pursuant to a search warrant. *Cooper*, 2008 WL 608336 at *13. The court in *Cooper* found no evidence that the government had deliberately intruded on the attorney client-relationship to obtain defense trial strategy because the search warrant related to an investigation of threats to potential witnesses, the prosecutor filed a declaration stating that he had not seen the material, and the officer conducting the search assured the prosecutor that it was done in a manner to respect attorney-client privilege. *Id.*

16

> The burden is on Defendant to demonstrate that the circumstances of the taping of any privileged call from the jail constitute an affirmative action by the government to intrude into the attorney-client privilege, rather than an inadvertent recording of such a call. . . . Mere possession by the prosecution of otherwise confidential trial strategy information does not establish prejudice.[33]

The *Guzman-Solis* Court then examined the facts of the case before it:

> In the present case, there was no government informant or meeting in the attorney's office. The conversation was improperly recorded at the jail, and the Court assumed that Defendant discussed trial strategy with his attorney. But there is no allegation, much less evidence, that the [jail] routinely tape records attorney-client telephone calls or visits or that [the jail] has no protocol for privileged calls or visits. In fact, the declarations of [two witnesses] establish procedures for both visits and ingoing and outgoing telephone calls and generally for maintaining confidentiality where appropriate. And there is no allegation or evidence that the prosecutor sought to obtain recordings of privileged conversations. Even defense counsel conceded at oral argument that the recording was negligent but inadvertent. Thus, the Court finds no evidence that taping the confidential attorney-client conversation was anything other than a mistake[.] . . . In other words, the recording itself does not demonstrate the kind of affirmative intrusion into the attorney-client relationship that concerned the court in *Danielson*.

> In addition, at oral argument, the prosecutor made an offer of proof regarding the circumstances of her request for jail recordings. She asserted that she requested Defendant's jail calls in preparation for trial and that because there were more than 10 hours of calls and the prosecutor believed that they were in Spanish, she asked a Border Patrol agent fluent in Spanish to listen to specific days of the calls relevant to the timeline of the case. The Border Patrol agent was not the case agent and not a member of the prosecution team. The agent listened to the specified calls and informed the prosecutor that at the beginning of one of the calls she recognized the defense attorney's voice and immediately turned off the call. No other calls were identified by the agent. Defendant submits evidence that the prosecutor was in possession of the taped call for approximately five months before notifying defense counsel and still has possession of the recording. But the prosecutor specifically represented that no calls between the Defendant and his attorney were listened to by anyone on the prosecution team.

---

[33] *Guzman-Solis*, 2015 WL 13283396 at *6 (citing *Danielson*, 325 F.3d at 1071–72).

> The Court finds that here, in contrast to *Danielson*, there is no evidence that the tape-recorded conversation was listened to by the prosecution or that the prosecution otherwise acquired knowledge of the contents of the privileged conversation. Therefore, there was no prejudice to Defendant.[34]

The Court concluded, "Because Defendant has not met his initial burden to show that the government purposefully intruded into Defendant's attorney-client relationship and there is no evidence that defense strategy was communicated to the prosecutor, the Court need not hold a *Kastigar* hearing. Nor will the Court disqualify the [prosecution]."[35]

Just as the court in *Guzman-Solis*, we find in the present case, "there is no allegation, much less evidence, that the [jail] routinely tape records attorney-client telephone calls or visits or that [the jail] has no protocol for privileged calls or visits."[36] In fact, at the second hearing, an individual from the third-party company that records the jail phone calls testified to such. The individual testified that the system has a mechanism for screening calls between attorneys and their clients. That mechanism is triggered by either (1) the attorney calling the company to notify the company of all the attorney's phone numbers so that the system can recognize those numbers and stop the recording of calls when those numbers appear or (2) the company itself obtains all phone numbers of attorneys listed in the phone book and manually inputs them to prevent the recording of calls associated with those numbers. Here, it appears that defense counsel called from a cell phone, which is why the system did not screen those calls. While the company's system is not flawless, it does

---

[34] *Id.* at *8.

[35] *Id.* at *9.

[36] *Id.* at *8.

18

erect safeguards against routine recording of attorney-client calls, supporting a conclusion that attorney-client calls are not routinely recorded.

Moreover, just as in *Guzman-Solis*, in this case, "there is no allegation or evidence that the prosecutor sought to obtain recordings of privileged conversations."[37] In other words, no evidence appears in this record to support a claim that the Commonwealth's Attorney's Office or the Sheriff's Department affirmatively sought to obtain Ward's privileged phone calls; rather, the obtaining of such calls was a mistake.

We acknowledge the one distinctive fact separating *Guzman-Solis* and this case—in *Guzman-Solis*, the prosecution heard none of the calls,[38] while in this case the evidence reveals that the prosecution admits to having heard no more than five to fifteen seconds of one call. Even so, the *Guzman-Solis* Court concluded that no Sixth Amendment violation occurred in that case because "there [was] no evidence that defense strategy was communicated to the prosecutor."[39] Likewise in the case before us, no evidence suggests that defense strategy was communicated to the prosecutor. The content of the conversations that Attorney Gamm heard was never disclosed at the hearings. And Detective Parker testified that the calls she heard only included calls between Ward and his mother and sister and one call between Ward and what she believed to be another inmate. As such, the difference in that fact alone between *Guzman-Solis* and this case cannot provide the basis for us to conclude that a Sixth

---

[37] *Id.*

[38] *Id.*

[39] *Id.* at *9.

19

Amendment violation occurred here because there is no evidence that the prosecution learned of Ward's defense strategy.

A recusal by Attorney Gamm would have been appropriate and could have averted to a large degree the struggle on this troublesome issue. But upon careful review of this record and the law, we find no abuse of discretion in the trial court's denying Ward's motion to disqualify the Commonwealth's Attorney's Office and the Sheriff's Department because Ward's Sixth Amendment right to counsel was not actually compromised.

## B. The trial court's denial of Ward's request to remove Juror 277 during jury selection was an error mandating reversal.

Ward next challenges the trial court's denial of his motion to remove three jurors—Juror 277, Juror 183, and Juror 238—for cause. The Commonwealth does not dispute preservation of these alleged errors, but we think the issue warrants discussion.

As outlined in *Gabbard v. Commonwealth*, to complain on appeal that a defendant was denied a peremptory challenge by a trial judge's erroneous failure to grant a for-cause strike, the defendant must use a peremptory challenge to remove the complained-of juror and then identify on his strike sheet any additional jurors he would have struck.[40] In this case, Ward's attorney clearly used a peremptory strike on Jurors 277 and 238. Whether Ward's attorney used a peremptory strike on Juror 183, however, is less clear. But after careful examination of the record, we conclude that he did.

---

[40] 297 S.W.3d 844, 854 (Ky. 2009).

20

Ward's attorney's strike sheet contains a list of jurors that made up the venire, identified by their juror numbers. A blue "X" appears on the sheet next to the names of eight of those jurors, signaling to the reviewing court that a peremptory strike was used on that juror. While a blue "X" appears next to Jurors 277 and 238, one does not appear next to Juror 183.

Nevertheless, immediately after the attorneys turned in their strike sheets to the bench clerk, but before the jury panel was selected, Ward's attorney approached the bench and made clear his effort to preserve the alleged errors with respect to Jurors 277, 238, and 183. The attorney stated to the trial court that he had used peremptory strikes for Jurors 277, 238, and 183 and that in order "to comply with *Gabbard*" he needed to designate on the record three jurors that he would have struck in their place had those peremptory strikes been available to him. He then stated that the jurors he would have struck were Jurors 153, 228, and 183. After the trial court pointed out that Juror 183 was one of the jurors for whom a peremptory strike was allegedly used, Ward's attorney turned to another attorney on Ward's team and asked him to find a different juror to designate instead of Juror 183. Still at the bench, Ward's attorney then addressed his co-counsel and asked, "[W]e did strike 183, right?" After the co-counsel gave an answer inaudible on the record, Ward's attorney turned to the bench clerk and asked, "Can I see that strike sheet?" The conversation with the clerk was not audible on the record, but after several moments, Ward's attorney returned to the bench and informed the trial court that he would have struck Juror 205.

Faced with Ward's attorney's interactions with the trial court and the bench clerk after he turned in his strike sheet, and his representation that he

21

had in fact used a peremptory strike on Juror 183, we are hesitant to rely solely on the face of the strike sheet as it appears in the record. Even if Ward's attorney had initially failed to use a peremptory strike for Juror 183, we think it is likely that he changed his peremptory strike selections to include Juror 183 when he conferred with the bench clerk, having not told the trial court anything else to correct his representation that he had in fact used a peremptory strike on Juror 183.

Based on the whole record before us, we take Ward's attorney at his word and conclude for the sake of this appeal that he did in fact exercise a peremptory strike on Juror 183. As such, Ward's attorney complied with *Gabbard* with respect to the alleged errors for Jurors 277, 238, and 183: He made motions to remove each of the three jurors for cause, and, after the trial court denied each motion, he used one of his allotment of peremptory strikes to remove each of them from the venire. He then identified orally on the record three additional jurors he would have struck: Jurors 153, 228, and 205.[41]

Moving forward, however, this Court finds it necessary to instate a new rule with respect to juror errors: To complain on appeal that a party was forced to use one of the party's peremptory challenges because of the trial court's erroneous failure to grant a for-cause strike, the defendant must use a peremptory strike on that juror *and show that the peremptory strike was used*

---

[41] In *Sluss v. Commonwealth*, 450 S.W.3d 279 (Ky. 2014), we held that a defendant substantially complied with *Gabbard's* requirement "that the defendant must identify *on the strike sheet* other jurors he would have struck" by instead identifying those jurors orally on the record. *See id.* at 284–85 (citing *Gabbard*, 297 S.W.3d at 854) (emphasis in original). Accordingly, Ward's attorneys adequately identified for our review the jurors they would have struck.

*on their strike sheet.* The defendant must then designate, again on his peremptory strike sheet, the jurors he would have struck had the peremptory strike been available to him. We recognize trial practice varies across the Commonwealth, but we find it necessary to require each of these designations to appear clearly on the party's strike sheet to achieve for appellate review a precise preservation of alleged jury-selection errors.

Finding that these errors are preserved in the case at hand, we now must determine whether the trial judge erred in denying Ward's motion to strike for cause Jurors 277, 238, or 183.

"Defendants are guaranteed the right to an impartial jury by the Sixth Amendment to the United States Constitution, as well as Section Eleven of the Kentucky Constitution. Denial of a defendant's right to an impartial jury is a structural error."[42] Accordingly, we review claims of a tainted jury for structural error. As such, harmless error analysis is not appropriate, and prejudice is presumed.[43]

Kentucky Rule of Criminal Procedure ("RCr") 9.36(1) identifies when a trial court should excuse a juror for cause: "When there is reasonable ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence, that juror shall be excused as not qualified." A trial court's decision on whether to strike a juror for cause is reviewed for abuse of discretion.[44] "Ultimately, '[i]t is the totality of all the circumstances . . . and the

---

[42] *Commonwealth v. Douglas*, 553 S.W.3d 795, 799 (Ky. 2018) (citing *Hayes v. Commonwealth*, 175 S.W.3d 574, 586 (Ky. 2005)).

[43] *Shane v. Commonwealth*, 243 S.W.3d 336, 341 (Ky. 2007).

[44] *Id.* at 338.

prospective juror's responses that must inform the trial court's ruling."[45] And "the mere fact that a prospective juror has been the victim of a crime like the crime being tried does not by itself imply a disqualifying bias. Additional evidence of bias is required."[46] "Obvious factors bearing on the likelihood of bias are the similarity between the crimes, the length of time since the prospective juror's experience, and the degree of trauma the prospective juror suffered."[47]

At the same time, we must adhere to the principle "that objective bias renders a juror legally partial, despite his claim of impartiality."[48] It is the "*probability* of bias or prejudice that is determinative in ruling on a challenge for cause."[49] The trial judge must "weigh the probability of bias or prejudice based on the entirety of the juror's responses and demeanor. *There is no 'magical question' that can rehabilitate a juror as impartiality is not a technical question but a state of mind.*"[50]

### 1. Juror 277.

Juror 277 stated that she had been raped between 2000 and 2001 when she was 17 years old. When asked why the perpetrator had never been charged, Juror 277 paused, began to cry, and explained that she never reported the rape because she was only 17 at the time and was not supposed

---

[45] *Little v. Commonwealth*, 422 S.W.3d 238, 242 (Ky. 2013).

[46] *Brown v. Commonwealth*, 313 S.W.3d 577, 598 (Ky. 2010) (citing *Woodall v. Commonwealth*, 63 S.W.3d 104 (Ky. 2001); *Hodge v. Commonwealth*, 17 S.W.3d 824 (Ky. 2000); *Sanders v. Commonwealth*, 801 S.W.2d 655 (Ky. 1990)).

[47] *Brown*, 313 S.W.3d at 598.

[48] *Montgomery v. Commonwealth*, 819 S.W.2d 713, 718 (Ky. 1991).

[49] *Id.* (citing *Pennington v. Commonwealth*, 316 S.W.2d 221, 224 (Ky. 1958))

[50] *Shane v. Commonwealth*, 243 S.W.3d 336, 338 (Ky. 2007) (emphasis added).

to be at the place where the crime occurred. When the prosecutor asked Juror 277 if she would be able to put aside her experiences and focus only on the facts of this case, she said "I would really like to think, that as a mother and as a woman that it would be an honor and a duty to do that, knowing the statistics of unreported abuse and rape, that's what I am sitting back in my bench evaluating."

The prosecutor then asked Juror 277 if she had done research on statistics regarding sexual abuse, and she said "yes, and I was a social worker for a while." When pressed further by the prosecutor as to whether she could be a "neutral juror, and not form any opinions until everything is done and over with," Juror 277 sighed and paused for 16 seconds on the record, appearing to fight back tears, and finally stated "I believe so, I believe I can do it."

When Ward's attorney asked if she would lean even the slightest bit toward a guilty verdict based upon her experience and not the facts, Juror 277 said "No because a couple reasons is that particularly what . . . happened to myself if I were in his shoes, so I think flipping the perspective helps. Two, I could never even pick that person out of a lineup to this day . . . I have moved on with my life, I'm a warrior and I'm not a victim and I think that . . . that speaks volumes to my ability to look at the case objectively and to say 'hey, you know sometimes things happen but sometimes things don't happen.'"

The prosecutor said he thought Juror 277 was qualified, focusing on the juror's claims that she could be impartial. After Ward's attorney made a motion to strike for cause, the trial court denied the motion without explanation.

25

Though we acknowledge that the decision to strike a juror for cause in the face of the juror's claims that she could look objectively at the case is a difficult one, this Court is constrained to conclude that the trial court nevertheless abused its discretion in not striking Juror 277 for cause. The totality of the circumstances indicates that there was reasonable ground to believe that Juror 277 could not render a fair and impartial verdict on the evidence. Despite the rape occurring some sixteen years before this case and the fact that she had "moved on with [her] life," it was apparent from Juror 277's demeanor in answering defense counsel and the Commonwealth's questions that she had suffered a significant degree of trauma. Juror 277 initially stated that she "would really like to think" that she would be able to set aside her experiences and focus only on the facts of the case, but she then stated that she was still "evaluating" that. And, even though she eventually told the prosecutor that she "believe[d]" that she could be a neutral juror, it was only after a significant pause and sigh and several moments of holding back tears.

From our careful review of the record, we conclude that the combination of Juror 277's demeanor and answers to the individual voir dire questions, coupled with the fact that the juror suffered a similar sexual offense crime as alleged by the victim in this case, should have prompted in the trial court a reasonable ground to believe that Juror 277 would not have been able to render an impartial verdict. While we commend Juror 277's candor and effort to participate in our justice system as an impartial juror, we cannot hold that allowing her on the jury would not infringe on Ward's guaranteed right to an impartial jury.

"The question then is whether the trial court's erroneous failure to grant the for-cause strike is a reversible error."[51] As previously stated, "ordinarily, such an error affects a substantial right of a defendant and is presumed prejudicial."[52] "However, such an error can be shown to be non-prejudicial if the other jurors the defendant would have used his peremptory strikes on do not actually sit on the jury."[53] In that scenario, the error is "effectively cured" and the defendant's substantive rights are ultimately not violated because he "received the jury he wanted."[54]

But this exception is not applicable in this case because one of the jurors that Ward's attorney would have struck—Juror 153—did in fact sit on the jury and deliberate. So the presumption of prejudice stemming from the trial court's failure to grant Ward's motion to strike for cause Juror 277 has not been refuted. Accordingly, Ward's conviction must be reversed.[55]

Though Ward's conviction is being reversed, we find it necessary to address other alleged errors as they are likely to recur on remand.

## C. Reversible error did not occur from the trial court's denial of Ward's motion to suppress.

Ward next argues that the trial court erred in denying Ward's motion to suppress evidence recovered by officers at the Ward residence in response to

---

[51] *Gabbard v. Commonwealth*, 297 S.W.3d 844, 854 (Ky. 2009).

[52] *Id.* (quoting *Shane*, 243 S.W.3d at 341) (quotation marks omitted).

[53] *Id.* (citing *King v. Commonwealth*, 276 S.W.3d 270, 279 (Ky. 2009)).

[54] *King*, 276 S.W.3d at 279.

[55] Because we find that Ward's conviction must be reversed based on the trial court's failure to strike Juror 277, we do not address whether the trial court erred in denying Ward's motion to strike Jurors 238 and 183.

27

Ward's statement during a recorded phone call with Cindy that he was going to burn the house down. That this issue is preserved for our review is undisputed.

As described earlier, after Cindy caught Ward livestreaming with the victim while the victim displayed herself naked, Cindy notified authorities. Authorities set up a controlled call between Cindy and Ward. During that call, Ward stated that he was going to burn his house down. In response to that statement, authorities were dispatched to the Ward residence to prevent Ward from destroying potential evidence. One officer stayed behind to obtain a search warrant.

Officers arrived at the Ward residence and attempted to contact Ward by knocking on the door, ringing the doorbell, and calling Ward's phone. Ward did not open the door for several minutes, but finally did so. The testifying officer could not recall whether the officers asked for permission to enter the Ward residence before doing so. When the officers entered the residence, they patted Ward down and discovered his cell phone. The officers asked Ward whether they could take his cell phone, to which Ward responded in the affirmative. An officer put Ward's cell phone in airplane mode, later explaining that authorities put cell phones in airplane mode to prevent a defendant from remotely wiping out any incriminating information on them. The officer then told Ward that they should all go have a seat so that the officers could explain the purpose of their presence.

An officer escorted Ward to the kitchen area where he informed Ward of the allegations against him and read Ward his *Miranda*[56] rights, but explicitly

---

[56] *Miranda v. Arizona*, 384 U.S. 436 (1966).

stated that Ward was not under arrest. While that occurred, other officers conducted a sweep of the house. After several minutes, Ward asked to leave in his car. An officer told Ward that he was free to leave but, suspecting potential evidence inside Ward's truck, that someone would have to pick him up or he could leave on foot. The officer then told Ward he could leave in his truck if Ward consented to the officers' search of the truck. Ward agreed, the officers searched the truck, and Ward left shortly thereafter.

Before Ward left, however, one of the officers had gone to get Ward a shirt and his wallet. While doing so, the officer saw a cell phone in plain view and gave it to another officer who, after Ward left the residence, put it in airplane mode and then placed the phone where it had been found. Officers found a third phone and put that one on airplane mode, as well. The officers testified that they did not take any photos, examine any devices, or open any drawers or other enclosures before the arrival of the search warrant. Once the warrant arrived, the officers conducted a full search of the Ward residence, seizing various electronic devices.

"In reviewing a trial court's ruling on a motion to suppress evidence, the reviewing court must first determine whether the trial court's findings of fact are supported by substantial evidence. If so, those findings are conclusive. The reviewing court then must conduct a *de novo* review of the trial court's application of the law to those facts."[57]

---

[57] *Epps v. Commonwealth*, 295 S.W.3d 807, 809 (Ky. 2009) (*overruled on other grounds by Davis v. Comm.*, 484 S.W.3d 288 (Ky. 2016)) (citing *Ornelas v. U.S.*, 517 U.S. 690, 697 (1996); *U.S. v. Martin*, 289 F.3d 392, 396 (6th Cir. 2002); *Adcock v. Commonwealth*, 967 S.W.2d 6, 8 (Ky. 1998)).

Ward challenges the constitutionality of essentially all the officers' actions before obtaining a search warrant. But even if we were to agree with Ward that the trial court erred in denying his motion to suppress, we can say with assurance that the trial court's purported error was harmless beyond a reasonable doubt.

"No error in . . . the admission . . . of evidence . . . is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order unless it appears to the court that the denial of such relief would be inconsistent with substantial justice."[58] "The court at every stage of the proceeding must disregard any error or defect in the proceeding that does not affect the substantial rights of the parties."[59] "[T]he inquiry is not simply 'whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand."[60] "As to those preserved constitutional errors which are subject to harmless error review, they must be shown to be 'harmless beyond a reasonable doubt' to be deemed harmless."[61] "It is well settled that constitutional search and seizure violations are not structural

---

[58] Kentucky Rules of Criminal Procedure ("RCr") 9.24.

[59] *Id.*

[60] *Murray v. Commonwealth,* 399 S.W.3d 398, 404 (Ky. 2013) (quoting *Kotteakos v. United States,* 328 U.S. 750, 765 (1946)).

[61] *Brown v. Commonwealth,* 313 S.W.3d 577, 595 (Ky. 2010) (quoting *Kotteakos,* 328 U.S. at 765).

30

improprieties requiring reversal, but rather, are subject to harmless error analysis."[62]

While Ward's argument is well-taken, Ward has not articulated how he was prejudiced by the trial court's denial of his motion. Ward has not pointed to any specific evidence discovered by the police during this sweep that the Commonwealth used against him at trial. Based on the officers' testimony, it appears that the only evidence recovered by the officers during their questionable searches and seizures was one or two cell phones, in addition to the cell phone that officers obtained when patting down Ward in their initial encounter with him. Yet Ward has not explained how the admission into evidence of the cell phones or any of their contents, or any other electronic devices or their contents that may have been seized before the obtaining of the search warrant, harmed him during his trial. In sum, Ward has not articulated any incriminating evidence recovered or potentially recovered during any of the purported unconstitutional searches and seizures that the Commonwealth used against him at trial, so we must conclude that any purported error committed by the trial court in denying Ward's motion to suppress was harmless error beyond a reasonable doubt.

## D. The trial court did not err in refusing to admit a social worker's conclusions about the victim's credibility stemming from past allegations of sexual abuse.

Ward argues that the trial court erroneously excluded from evidence accusations by the victim that her brother sexually abused her. That this issue is preserved for our review is undisputed.

---

[62] *State v. Esarey*, 67 A.3d 1001, 1009 (Conn. 2013) (internal citations omitted).

31

Two witnesses, a detective and a social worker, testified concerning the victim's prior allegations against her brother. Both witnesses investigated claims by the victim that the victim's brother "put toys in [the victim's] rear end," "tried to rape [the victim]," attempted to see the victim naked, and played a game with the victim where he would touch the victim over her clothes, simulate sexual intercourse on her, and touch her private area. The detective testified that she believed the allegations to be true but non-criminal in nature, so she closed her investigation. The social worker testified that she was "unable to substantiate" the victim's claims and closed the investigation. However, the social worker testified that "unable to substantiate" did not mean that the allegations were false—it simply meant that there was no basis for continuing the investigation.

Kentucky Rules of Evidence ("KRE") 412(a) prohibits "in any . . . criminal proceeding involving alleged sexual misconduct . . . [e]vidence offered to prove that any alleged victim engaged in other sexual behavior [and] [e]vidence offered to prove any alleged victim's sexual predisposition." But "[o]n its face, KRE 412(a) does not apply to evidence that a witness has made prior *false* accusations of sexual abuse."[63] "[E]vidence, including cross-examination, concerning an alleged sex-crime victim's allegations of sexual impropriety against another is not admissible at trial unless the proponent of the evidence establishes at a KRE 104 hearing that the prior accusation was demonstrably

---

[63] *Perry v. Commonwealth*, 390 S.W.3d 122, 129 (Ky. 2012) (emphasis in original).

false."[64] "To meet that standard, the proponent must show that there is a distinct and substantial probability that the prior accusation was false."[65]

"The standard of review of an evidentiary ruling is abuse of discretion."[66] "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[67]

After review of the record, we cannot say that the trial court abused its discretion when excluding from evidence testimony regarding the victim's prior allegations of sexual misconduct made against her brother. The investigating detective testified that she believed the victim's accusations to be true. The investigating social worker testified that her concluding that she was "unable to substantiate" the victim's claims is different from concluding that they were false. The sum of the witnesses' testimony leans toward supporting a conclusion that there is more truth in the victim's allegations than not. Therefore, the trial court did not act arbitrarily, unreasonably, or unfairly in believing that there was not "a distinct and substantial probability that the prior accusation was false."[68] The trial court did not abuse its discretion in excluding the victim's allegations from evidence.

**E. Ward's Unanimity Challenges.**

Finally, Ward argues that he was denied a unanimous verdict on several of his convictions and requests palpable error review of this issue, conceding

---

[64] *Dennis v. Commonwealth*, 306 S.W.3d 466, 475 (Ky. 2010).

[65] *Id.*

[66] *Anderson v. Commonwealth*, 231 S.W.3d 117, 119 (Ky. 2007).

[67] *Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000).

[68] *Dennis*, 306 S.W.3d at 475.

that it was unpreserved. Having reversed and remanded Ward's case for a new trial because of the trial court's failure to strike a juror for cause, we decline to address errors stemming from the jury instructions. But we note that this Court has held in several cases that "a general jury verdict based on an instruction including two or more separate instances of a criminal offense, whether explicitly stated in the instruction or based on the proof—violates the requirement of a unanimous verdict."[69] On remand, all jury instructions must be more carefully crafted to comply with our requirements set out in these cases.

## I. CONCLUSION.

For the foregoing reasons, the judgment is reversed, and the case is remanded to the trial court for further proceedings in conformity with this opinion.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Shannon Renee Dupree
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Micah Brandon Roberts
Assistant Attorney General

---

[69] *Johnson v. Commonwealth,* 405 S.W.3d 439, 449 (Ky. 2013). *See also Kingrey v. Commonwealth,* 396 S.W.3d 824 (Ky. 2013); *Martin v. Commonwealth,* 456 S.W.3d 1 (Ky. 2015); *Ruiz v. Commonwealth,* 471 S.W.3d 675 (Ky. 2015); and *Jenkins v. Commonwealth,* 496 S.W.3d 435 (Ky. 2016).